MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: CHRISTINA PAGLIA BISCHOFF (CP-2371)
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
(212) 637-1204

**05 CV 9548**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
                                     :
UNITED STATES OF AMERICA,            :    05 Civ.
                                     :
            - v. -                   :
                                     :
ALL RIGHT, TITLE AND INTEREST        :    VERIFIED COMPLAINT
IN REAL PROPERTY AND                 :
APPURTENANCES LOCATED AT             :
11 NORTH AVENUE EAST, CRANFORD,      :
NEW JERSEY,                          :
                                     :
ALL RIGHT, TITLE AND INTEREST        :
IN REAL PROPERTY AND                 :
APPURTENANCES LOCATED AT             :
63 SOUTH RIDGEDALE AVENUE,           :
EAST HANOVER, NEW JERSEY,            :
                                     :
ALL RIGHT, TITLE AND INTEREST        :
IN REAL PROPERTY AND                 :
APPURTENANCES LOCATED AT             :
78 TAKOLUSA DRIVE, HOLMDEL,          :
NEW JERSEY,                          :
                                     :
ALL RIGHT, TITLE AND INTEREST        :
IN REAL PROPERTY AND                 :
APPURTENANCES LOCATED AT             :
409 BAY AVENUE, HIGHLANDS,           :
NEW JERSEY,                          :
                                     :
ALL RIGHT, TITLE AND INTEREST        :
IN REAL PROPERTY AND                 :
APPURTENANCES LOCATED AT             :
64 MONMOUTH STREET,                  :
RED BANK, NEW JERSEY,                :
                                     :
ALL RIGHT, TITLE AND INTEREST        :
IN REAL PROPERTY AND                 :
APPURTENANCES LOCATED AT             :

```
5245, 5255, 5265, 5275 AND 5285    :
NORTH MELPOMENE WAY,
TUCSON, ARIZONA,                   :

              Defendants-in-rem.   :
-------------------------------------x
```

Plaintiff United States of America, by its attorney, MICHAEL J. GARCIA, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

## I. JURISDICTION AND VENUE

1. This action is brought pursuant to 21 U.S.C. § 881 and 18 U.S.C. § 981(a)(1)(A) by the United States of America seeking the forfeiture of ALL RIGHT, TITLE AND INTEREST IN REAL PROPERTY AND APPURTENANCES LOCATED AT: (1) 11 NORTH AVENUE EAST, CRANFORD, NEW JERSEY; (2) 63 SOUTH RIDGEDALE AVENUE, EAST HANOVER, NEW JERSEY; (3) 78 TAKOLUSA DRIVE, HOLMDEL, NEW JERSEY; (4) 409 BAY AVENUE, HIGHLANDS, NEW JERSEY; (5) 64 MONMOUTH STREET, RED BANK, NEW JERSEY; and (6) 5245, 5255, 5265, 5275 AND 5285 NORTH MELPOMENE WAY, TUCSON, ARIZONA (collectively, the "DEFENDANT PROPERTIES").

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355. Venue is proper under 28 U.S.C. §§ 1355(b) and 1395(b) because certain actions giving rise to forfeiture took place in the Southern District of New York.

II.   PROBABLE CAUSE FOR FORFEITURE

Introduction

3.   At all times relevant to this Complaint, and from at least 1997 until at least in or about 2004, Mark Munson was the leader of a marijuana trafficking organization operating within the Southern District of New York, among other places.

4.   Mark Munson is currently charged with violations of Title 21 of the United States Code in a criminal complaint filed in this District, which is attached hereto as Exhibit A. The contents of the criminal complaint are incorporated herein.

5.   Munson's profits from the marijuana conspiracy, totaling in the millions of dollars, were funneled in part to his paramour, Melissa Long, and through Long to other co-conspirators of Munson.

6.   Melissa Long used such profits to purchase real property, restaurants, and to finance multi-million dollar gambling activity.

Long's Unexplained Wealth

7.   According to tax records, prior to her involvement with Munson, Long listed that she was a freelance entertainer/dancer with a declared gross income of $10,110 in 1994 and $6,450 in 1995. In 1997, Long listed herself on a residential loan application as a homemaker with no monthly income.

8. In 1999, after becoming involved with Munson, Long purchased a property at 11 North Avenue East, in Cranford, New Jersey for $500,000 (the "Cranford Property").

9. Long did not obtain a mortgage for the Cranford Property but rather made payments directly to the sellers. Those payments consisted of proceeds from the drug conspiracy.

10. Because Long's income on its face was wholly insufficient to withstand any scrutiny of the purchase, another member of the Munson drug conspiracy was listed as a co-buyer in the public records in order to disguise the true source of the funds. The co-conspirator later sold his share of the Cranford Property to Long for one dollar.

11. In 2000, the following year, Munson provided Long with additional drug proceeds in order to invest in at least three other properties with all-cash purchase prices totaling over $150,000. In that same year, Munson provided Long with drug proceeds in order to finance the opening of a restaurant, the Thai Elephant.

12. According to a cooperating witness ("CW"), Munson stated that the restaurant was a great way to get money into play, i.e., to launder drug proceeds. On one occasion, the CW picked up approximately $250,000 in cash in $10,000 bundles from Munson at the Thai Elephant in order to transport it to other members of the conspiracy.

13. In 2001, Long purchased two other properties financed by Munson's drug activities. One of those properties, 63 South Ridgedale Avenue, East Hanover, New Jersey (the "East Hanover Property"), was the site of money pick-ups by at least three members of the Munson drug conspiracy. In 2003, Long transferred the ownership of the East Hanover Property to another one of Munson's co-conspirators.

14. In 2002, Long again laundered Munson's drug profits by purchasing multiple properties. For example, Long used $110,000 to purchase a property at 1524 Munn Avenue without any loans, which was later transferred to another Munson co-conspirator, who has since pled guilty to conspiracy to distribute marijuana. Long also used a half a million dollars in cash – approximately $513,281 – to purchase parcels of land in Arizona – located at 5245, 5255, 5265, 5275 and 5285 North Melpomene Way in Tucson, Arizona – using the name "AO and ML Properties LLC." According to the Articles of Organization, Melissa Long is the sole member of that company. The properties were transferred to the company by a Munson drug associate, who has since pled guilty to conspiracy to distribute marijuana.

15. In 2003, Long again laundered Munson's drug profits by purchasing multiple properties and opening restaurants, including the following transactions: (1) Long

purchased a property at 409 Bay Avenue, Highlands, New Jersey, for $315,000, without any loans, which she used to start a restaurant business, "Rice;" (2) Long started a restaurant business, "Teak," at 64 Monmouth Street, Red Bank, New Jersey, which property she later purchased for $1.65 million; and (3) Long purchased a property at 78 Takolusa Drive, Holmdel, New Jersey, for approximately $1,135,000, financed in part by no-document bank loans.

16. Without Munson's drug dollars, Long could not have afforded her extensive real estate purchases and business start-up costs, as well as her multi-million dollar gambling activity. According to Currency Transaction Reports filed by various Atlantic City and Las Vegas casinos, from 1999 through 2003, Long brought at least $1,695,430 into the casinos and took $1,165,541 out of the casinos, reflecting gambling losses of at least half a million dollars.

### III. CLAIMS FOR FORFEITURE

17. Incorporated herein are the allegations contained in paragraphs one through 16 of this Verified Complaint.

18. Title 21, United States Code, Section 881(a)(6) subject to forfeiture all proceeds traceable to exchanges of controlled substances.

19. Title 21, United States Code, Section 881(a)(7) further subjects to forfeiture:

> All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

20. In addition, Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property real or personal involved in a transaction or attempted transaction in violation of . . . section 1956, 1957 . . . of this title, or any property traceable to such property."

21. Title 18, United States Code, Section 1956(a) provides:

> (a)(1) [w]hoever knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of Section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B) knowing that the transaction is designed in whole or in part -- (i) to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity; or to avoid a

>transaction reporting requirement under State or Federal law.

22.  A "financial transaction," as defined by 18 U.S.C. § 1956(c)(4), includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . . ."

23.  "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term includes any offense under 18 U.S.C. § 1961(1).  Section 1961(1) lists as an offense "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States."

24.  Title 18, United States Code, Section 1957 provides, in pertinent part:

>(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).
>
>\* \* \*
>
>(d) The circumstances referred to in subsection (a) are --
>
>(1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States . . . . Because the Defendant Funds relate to the concealment and laundering of narcotics proceeds, such funds

are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as they represent property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 1956(a)(1)(B)(ii), and property traceable to such property.

25. By the reason of the above, the DEFENDANT PROPERTY is subject to forfeiture to the United States of America.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the DEFENDANT PROPERTY and that all persons having an interest in such be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the DEFENDANT PROPERTY to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
       November 10, 2005

> MICHAEL J. GARCIA
> United States Attorney for the
> Southern District of New York
> Attorney for the Plaintiff
> United States of America
>
> By: _____
>     CHRISTINA PAGLIA BISCHOFF (CP-2371)
>     Assistant United States Attorney
>     One St. Andrew's Plaza
>     New York, New York 10007
>     (212) 637-1204

<u>VERIFICATION</u>

STATE OF NEW YORK           )
COUNTY OF NEW YORK          :
SOUTHERN DISTRICT OF NEW YORK )

    KENNETH WASLEY, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration, and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof; and that the same is true to the best of his own knowledge, information and belief.

    The sources of deponent's information and the ground of his belief are official records and files of the United States and various financial institutions, and information obtained directly by deponent during an investigation of alleged violations of Title 18 and 21, United States Code.

                                        KENNETH WASLEY
                                        Special Agent
                                        Drug Enforcement Administration

Sworn to before me this
____ day of November, 2005

_____
NOTARY PUBLIC

JEANETTE ANN GRAYEB
Notary Public, State of New York
No. 01QR1541575
Qualified in Kings County
Commission Expires Nov 30, 2005

10

# EXHIBIT A

Approved: _____
JASON P.W. HALPERIN
Assistant United States Attorney

Before:   THE HONORABLE FRANK MAAS
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :   05 MAG 1812
                                        COMPLAINT
            - v. -                  :
                                        Violation of
                                    :   21 U.S.C. § 846
MARC MUNSON,                        :
                                        COUNTY OF OFFENSE
                                    :
                Defendant.          :   NEW YORK
                                    :

- - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

      KENNETH WASLEY, being duly sworn, deposes and says that he is a Special Agent with the United States Drug Enforcement Administration ("DEA"), and charges as follows:

### COUNT ONE

      1.   From in or about June 1997, up to and including in or about February 2004, in the Southern District of New York and elsewhere, MARC MUNSON, the defendant, and others known and unknown, unlawfully, intentionally, and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

      2.   It was a part and an object of the conspiracy that MUNSON, the defendant, and others known and unknown, unlawfully, intentionally, and knowingly would and did distribute and possess with intent to distribute a controlled substance, to wit, 1000 kilograms and more of mixtures and substances containing a detectable amount of marijuana, in violation of Title 21, United States Code, Sections 812, 841(a)(1) and 841(b)(1)(A).

      (Title 21, United States Code, Section 846.)

      The bases for my knowledge and for the foregoing charge, are, in part, as follows:

      3.   I am a Special Agent with the DEA, and I have been personally involved in the investigation of this matter. This

affidavit is based on my personal knowledge as well as conversations with other law enforcement agents and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

        4. I have been employed as a Special Agent for approximately two years. I am currently assigned to the New York Field Division. I have participated in numerous investigations of unlawful controlled substance trafficking and have conducted or participated in surveillance, undercover narcotics operations, the execution of search warrants, and review of controlled substances records. Through my training, education, and experience, I have become familiar with methods by which controlled substances are transported, stored, and distributed.

        5. During my investigation, I have interviewed approximately four cooperating witnesses ("CW-1," "CW-2," "CW-3," and "CW-4"). In addition, other agents with whom I have spoken have interviewed an additional cooperating witness ("CW-5"). All five cooperating witnesses have provided information in this investigation that has proven reliable and has been corroborated by other information. All five cooperating witnesses have pled guilty to federal narcotics offenses. Based on these interviews, I have learned the following:

        a. In 1997, CW-1 was introduced to MARC MUNSON, the defendant, so they could work together to transport multi-kilogram quantities of marijuana from Tucson, Arizona to the New York City area and elsewhere. During trips to New York, CW-1 picked up money from MUNSON and an uncharged co-conspirator for deliveries of marijuana. MUNSON would purchase marijuana seeds from overseas and would give them to individuals in Mexico so they could grow a higher quality of marijuana. CW-1 added that MUNSON would arrange for an uncharged co-conspirator to travel to Arizona to select MUNSON's bales of marijuana. CW-1 added that he delivered marijuana to MUNSON in the New York City area, as well as Chicago, Detroit and Kentucky. CW-1 also revealed that in or about February 2001, MUNSON started to purchase marijuana from Las Vegas so he could avoid having to deal with individuals in Mexico.

        b. CW-1 visited the house of MARC MUNSON, the defendant, in Brooklyn, New York, in or around 2000 and received about $250,000 in cash from MUNSON that MUNSON instructed CW-1 to

give to the individuals in Mexico who had sold MUNSON the marijuana. Overall, from in or about 1997 to in or about 2003, approximately 40,000 lbs of marijuana was delivered to the New York City area from the Tuscon, Arizona area on behalf of MUNSON.

   c. CW-2 met MUNSON in or about 1997, and at that meeting, MUNSON told CW-2 and CW-5 that MUNSON needed more marijuana. CW-2 stated that CW-1 could supply MUNSON with more marijuana. As a result of this meeting, in or about October 1997, CW-2 made a trip to deliver marijuana to MUNSON's co-conspirators. From in or about October 1997 through in or about July 1998, CW-2 made approximately five more trips delivering marijuana on MUNSON's behalf.

   d. In total, CW-2 made a minimum of 20 trips delivering marijuana on behalf of MUNSON, and approximately nine trips where CW-2 picked up money directly from MUNSON that CW-2 was then supposed to deliver to the source of supply of the marijuana.

   e. CW-3 was paid approximately $1,500 to assist CW-5 in transporting about $150,000 in a hidden compartment of a vehicle from the New York City area to Las Vegas, Nevada in or about November 2001. CW-5 later told CW-3 that the money CW-3 was paid and the money that CW-3 had transported was from MUNSON. CW-5 also told CW-3 that the money had come from sales of marijuana.

   f. CW-4 first met MUNSON in or about 1997. In or about 1997, CW-4 and CW-1 delivered a shipment of marijuana from Tuscon, Arizona to Amityville, New York on behalf of MUNSON. CW-4 added that MUNSON led CW-4 and CW-1 to the Amityville address. In or about December 2001, CW-4 drove to MUNSON's house in New Jersey with CW-5 to pick up an undetermined amount of money that was stored in MUNSON's bedroom or in his house gym.

   g. CW-5 knew that MUNSON had been selling marijuana since at least 1999. CW-5 would count money for MUNSON. MUNSON asked CW-5 to be his representative to one of MUNSON's sources of supply of marijuana. CW-5 picked up in the range of $50,000 to $300,000 from MUNSON's former home address in New Jersey on about 12 different occasions between in or about 2001 through in or about May 2003.

   6. CW-1 informed other agents that CW-1, MARC MUNSON, the defendant, and other co-conspirators met at numerous locations in Manhattan from in or about 1997 through in or about 2003 to discuss plans for future marijuana deals. At these

3

meetings, MUNSON would also give CW-1 and other co-conspirators cash from drug proceeds for their participation and for CW-1 and the others to pay the marijuana suppliers for shipments that had already been received. These Manhattan locations included the Plaza Hotel, the Millennium, the Park Lane Hotel, and the Royalton.

7. In or about March 2003, DEA agents with whom I have spoken in Michigan seized numerous boxes containing marijuana from a tractor-trailer. About 15-18 of these boxes had orange stickers on them. CW-5 informed the agents that these boxes, which contained more than 1,000 pounds of marijuana in total, were being delivered on MUNSON's behalf to MUNSON's co-conspirators in the New York City area and elsewhere.

WHEREFORE, deponent prays that MARC MUNSON, the defendant, be imprisoned or bailed, as the case may be.

KENNETH WASLEY
Special Agent
U.S. Drug Enforcement
Administration

OCT 2 6 2005

Sworn to before me this ____ day of October, 2005.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

**FRANK MAAS**
United States Magistrate Judge
Southern District of New York

4